## Case No. 15,092.

### UNITED STATES v. FIFTY-EIGHT THOUSAND EIGHT HUNDRED AND FIFTY CIGARS.

[21 Law Rep. 267.]

Circuit Court, D. Massachusetts. May Term, 1857.

CUSTOMS DUTIES—CONCEALMENT OF GOODS—TIME FOR ENTRY.

1. Under section 68 of the collection act of 1799 (1 Stat. 677), the concealment of goods which works a forfeiture need not be with the concurrence, knowledge, or consent of the owner or consignee.

2. Such forfeiture may be enforced before the time has passed for the owner to enter the goods. A subsequent offer within such time to enter them, cannot affect the forfeiture, though made as soon as the owner was aware of their arrival.

[Appeal from the district court of the United States for the district of Massachusetts.]

This was a libel of information founded on the sixty-eighth section of the collection act of 1799 (1 Stat. 677). The district court decreed a forfeiture [case unreported], and the claimants appealed.

In this court certain facts were agreed as follows: The bark Medora, Capt. Robey, of Portland, Maine, arrived in the harbor of Boston, from Havana, on the 11th of December, 1854, and her manifest was on that day produced to the boarding-officer, and endorsed by him. The vessel was reported at the custom house by the master, on the 12th of December, 1854, and the usual oath taken by the master. The vessel was loaded with molasses, consigned to R. C. Hooper, of Boston, and had also on board the cigars in controversy, to wit, 58,850 cigars, which were not on the manifest. There was also another lot of cigars, to wit, 7,000, entered on the manifest, shipped by Cabarga, consigned to the master, Robey; and an ullage thousand entered as ship's stores. On the said 12th day of December, William W. Parker, assistant deputy surveyor, Thomas P. Wilson, an aid to the revenue, with a boarding-officer and a boatman, went on board the vessel,—still lying in the

stream, about a mile and a half from the wharf,—and made search, suspecting that cigars were concealed on board. The cigars mentioned in the information, were found separate from the residue of the cargo, in the following manner: The officers in search took up the floor of the lower cabin, in doing which they were obliged first to remove a wash-sink, which was fastened to the floor, and some other heavy articles. After taking up two or three of the boards composing the floor of the cabin, they discovered a double flooring, about a foot apart, between which and the upper flooring, they found four boxes of cigars, containing five hundred cigars in each box. The upper flooring was not nailed down; it rested on timbers. No trap-door or scuttle led to the place where these cigars were found, and the only way to get to them was to take up the floor of the lower cabin, as was done. The officers continued the search. On each side of the cabin, between the last berth and the bulkhead that divided the cabin and hold, was a door leading into a closet, the floor of the closet being even with the cabin floor. The door of the closet was not fastened. In one of these closets, piled up on the floor, were the boxes which contained the seven thousand cigars that were entered on the manifest, and the ullage thousand entered as ship's stores. These boxes were in open sight, and there was no appearance of any thing being concealed or deposited behind them. The partition of each closet was made of boards, painted, and matched together, and to all appearance were permanent partitions. On removing the floor in these closets, which was a rough flooring, and taking down the partitions, the officers discovered and took out, in boxes, fifty-eight thousand eight hundred and fifty cigars, about equally divided in number in each of the places last mentioned. There was no access to these places behind the partitions, either by door, window, slide, or otherwise; but on removing the floor and partitions, a space was discovered, extending under the deck of the vessel, and in these spaces on each side of the vessel, said cigars were found, in boxes of different sizes, with Spanish brands. The two closets were large enough to have held all the cigars which were found on board, without putting any behind the partitions. The officers seized the cigars found as above, and they are the same described in the information, and no duties have been paid on them. The manifest was dated December 2, 1854. The cigars were shipped on board of the Medora, November, 1854, at Havana, for Boston, by Antonio Cabarga, a merchant at Havana, and were sent by him to Albert W. Porter, for his account, and that of T. G. Mitchell. They were all shipped to A. W. Porter as the consignee, by orders from A. W. Porter and T. G. Mitchell, in Portland, to Cabarga, who was paid for the cigars partly by R. Morrison & Co., at Havana, for said Porter, and partly by proceeds of sales of

goods that A. W. Thayer had sent out to Havana in the Medora. They were paid for before the Medora sailed. Edwin Parker, of Boston, a commission merchant, had been requested by S. W. Porter, of Portland, who was the principal owner of the bark, before her arrival, to take care of her when she arrived, on account of the captain being intemperate. Upon learning the fact of her arrival, he made immediate efforts to find the captain, but did not find him until the 14th of December. He then found him enfeebled in body and mind, intoxicated, and incompetent for business. Said Parker took charge of the vessel, went to the custom house on the said fourteenth day of December, and found that the cigars of the claimants were not on the manifest; and as their agent, and the agent of the captain, offered to amend the manifest, and to make a post or amended entry, and to pay the duties thereon—which offer was refused by the collector. Said Parker had not then received any invoice or bill of lading of the cigars. Afterwards he did receive the papers hereunto appended, marked "A." On the 18th of December, the molasses was entered by the consignee thereof, after which the unlading of the cargo was begun. The cigars seized were appraised at $1,690.95.

A.

Memorandum of Cigars put on board the bark Medora, for account of A. W. Porter, Esq.

| | | |
|---|---|---|
| 20 M Esmeraldas, London size, @ $18 | $ | 360 00 |
| 10 M Crisols, "    "  @ $16 | | 160 00 |
| 10 M Corona, seconds, @ $25 | | 250 00 |
| 10 M Corona, thirds, @ $20 | | 200 00 |
| Export duties and boat hire | | 38 50 |
| | $1,008 | 50 |

| | | |
|---|---|---|
| 10 M Rio Hondo, thirds, @ $14 | $ | 140 00 |
| 6 M La Marina, @ $20 | | 120 00 |
| 6 M Infancia, @ $17 | | 102 00 |
| Export duties and boat hire | | 17 00 |
| | $ | 379 00 |

B. F. Hallett, for the United States.
J. A. Andrew, contra.

CURTIS, Circuit Justice. The objection made at the bar to the decree of the district court is that when these goods were seized the time had not arrived for the claimants to enter them; that it did not appear they were in any way connected with the concealment of the goods, or intended to defraud the revenue; and that in point of fact, their agent offered to enter and pay the duties on the goods, as soon as he was aware of their arrival. And it is urged that it was not the purpose of congress, nor required by the true construction of the section in question, to inflict a forfeiture upon an owner who was innocent of any fraud, and had not been guilty even of any laches. The sixty-eighth section of the collection act, on which the libel is founded, provides that "Every collector, &c., shall have full power and authority to enter any ship or vessel in which they shall have

reason to suspect any goods, wares, or merchandise, subject to any duty, are concealed; and therein to search for, seize, and secure any such goods, wares, and merchandise; and all such goods, wares, and merchandise, on which the duty shall not have been paid, or secured to be paid, shall be forfeited."

It has been decided that the concealment here spoken of is a withdrawal of the goods from public view, on account of their being subject to duties, or from some fraudulent motive. U. S. v. 1,250 Chests of Tea, 12 Wheat. [25 U. S.] 498. The question is, whether such withdrawal must be by the owner or consignee, or by his procurement, or with his concurrence. So to hold would be to require what the language of the act does not require. That makes the forfeiture depend solely on the concealment of goods on which the duties have not been paid or secured, without regard to the person by whom the concealment was practised. Nor are the subject-matter of the law, and the mischief it was designed to prevent, such as to call for a construction which would render the act or concurrence of the owner or consignee necessary. That subject-matter is a concealment of dutiable goods, with intent to avoid payment of the legal duties thereon, or some other fraudulent intent. Whether this be done by the master alone, or by him in combination with the consignee, the revenue is endangered. Congress might have provided that the forfeiture should not be inflicted unless the time had passed for the consignee to make entry of them. But this would have put it in the power of the consignee to avail of the concealment, and smuggle the goods, if opportunity should offer, after arrival, and before the expiration of the fifteen days allowed for their entry; and to enter them, and escape all punishment, if he should find he could not profit by the concealment. In other words, it would not have punished the mere concealment, which it was the manifest purpose of this section to prevent. So far from providing that there must not only be a concealment, but the time must have arrived for the consignee to act, this section sets up a different standard. It requires, to escape a forfeiture on account of concealment, that the duties should have been actually paid, or secured to be paid. Nothing short of this is sufficient; and this is inconsistent with the construction contended for by the claimants, when they insist that it is enough that the time had not arrived to enter the goods.

The argument derived from the alleged injustice of punishing the owner of the property for an act which he neither practised nor consented to, has been often addressed to the courts of the United States in similar cases, but has never induced them to insert in a law a substantive requirement which it did not contain.

It was pressed on Chief Justice Marshall in U. S. v. The Little Charles [Case No. 15,612], which was a libel for a forfeiture under the embargo laws. The answer he made was: "This is not a proceeding against the owner; it is a proceeding against the vessel, for an offence committed by the vessel; which is not the less an offence, and does not the less subject her to forfeiture, because it was committed without the authority and against the will of the owner." So in the case of The Malek Adhel, 2 How. [43 U. S.] 233, which was a libel to enforce a forfeiture on account of piratical aggression, the question was made whether the innocence of the owners could withdraw the ship from the penalty of confiscation under the act of congress; and, upon the ground that the act made no exception whether the aggression be with or without the co-operation of the owner; and that it was not uncommon, in cases under the revenue and other laws, to treat the acts of the master and crew as binding the interest of the owner, it was held that no co-operation by him need be shown. And though in that case the cargo was held exempt, it was because the act did not, by its terms, exact its forfeiture. (See also the other cases therein referred to.) Revenue laws should be so construed as effectually to prevent the mischief which they were designed to prohibit. Taylor v. U. S., 3 How. [44 U. S.] 197. To require the co-operation of the owner in concealing the property to be shown, would leave a wide opening for fraud. No doubt cases of hardship may possibly occur; but they are provided for by the power to remit the forfeiture, lodged with the secretary of the treasury.

I think I ought to say further that in this particular case, though the consignees may be entirely innocent, yet in the actual state of the proofs before me, the burthen of proof is upon them, and they have failed to support that burthen. Under the seventy-first section of the collection act, where probable cause for the prosecution is shown to the court, the burthen is on the claimant. Here the goods were not only found concealed under such circumstances as tended very strongly to show an intention to evade payment of duties, but they were imported without any invoice, bill of lading, or consular certificate, the absence of which directly implicates the owners of the goods, and affords a strong prima facie case of an intent to smuggle them, and this is not met by evidence on their part.

The decree of the district court is affirmed, with costs.